Sheila MATHON and Hank Mathon, Husband and Wife, Plaintiffs,

v.

MARINE MIDLAND BANK, N.A. Hongkongbank and Shanghai Bank Corporation Limited, Duane Leonard, Karen Karates, Neil Gross, Frank Culhane, Esq., Marine Midland Mortgage Corp., Laura Glulseppotti, Philip Irwin Aaron, P.C., Shapiro & Kreisman, The Law Firm, Gerald Shapiro, David S. Kreisman, Dominick Vinceslio, Stanley Stuart, Paul Rudden, Felicia Renee Durkin, "John Doe" One, "John Doe" Two, "John Doe" Three, "John Doe" Four, Jointly and Severally, Defendants.

No. CV 94–2265 (ADS).

United States District Court, E.D. New York.

Feb. 4, 1995.

Sheila Mathon and Hank Mathon, pro se.

Philip Irwin Aaron, P.C. by Jules A. Epstein, Syosset, NY, for defendants Philip Irwin Aaron, P.C. and Paul Rudden.

Cullen & Dykman by John P. McEntee, Garden City, NY, for defendants Marine Midland Bank, N.A., Marine Midland Mortg. Corp. and Duane Leonard.

Cahn Wishod & Lamb by Robert Folks, Melville, NY, for defendants Shapiro & Kreisman, Gerald Shapiro, David S. Kreisman, Karen Karates, Neil Gross, Frank Culhane, Felicia Renee Durkin & Dominick Vinceslio.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

This action arises out of a residential lease agreement "with option to buy" entered into between the plaintiffs *pro se*, Hank Mathon and Sheila Mathon who are husband and wife ("the plaintiffs" or "the Mathons"), and a person identified by the plaintiffs as the owner of the residence named Stanley Stuart ("Stuart"). The plaintiffs allege that the defendants acted in violation of the civil Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO").

The plaintiffs move for entry of default judgment pursuant to Fed.R.Civ.P. 12(a) and 15(a) against the following defendants contending that they did not interpose an answer to the plaintiffs' Amended Complaint or otherwise move within the time allotted by the civil rules: Marine Midland Bank, N.A., Hongkong and Shanghai Bank Corp., Ltd., Marine Midland Mortgage Corp., Duane Leonard, Laura Glulseppotti, Shapiro & Kreisman, Gerald Shapiro, David S. Kreisman, Karen Karates, Neil Gross, Frank Culhane Esq., Felicia Renee Durkin and Dominick Vinceslio. The defendants Philip Irwin Aaron, P.C. and Paul Rudden, served an answer on July 12, 1994.

Two motions to be relieved of default pursuant to Fed.R.Civ.P. 55(c) and 60(b) are before the Court from: 1) Shapiro & Kreisman, Gerald Shapiro, David S. Kreisman, Karen Karates, Neil Gross, Frank Culhane, Felicia Renee Durkin and Dominick Vinceslio (the "Shapiro defendants"); and 2) Marine Midland Bank, N.A., Marine Midland Mortgage Corp. and Duane Leonard (the "Marine Midland defendants"). In addition, Philip Irwin Aaron, P.C. and Paul Rudden (the "Aaron defendants"), the Shapiro defendants and the Marine Midland defendants move for an order dismissing the Amended Complaint pursuant to: 1) Fed.R.Civ.P. 12(b)(6) for failure to state a cause of action; 2) Fed. R.Civ.P. 9(b) for failure to plead fraud with particularity; and 3) 12(b)(1) for lack of subject matter jurisdiction over the pendant state claims.

## BACKGROUND

In November, 1992, the Mathons signed a one year lease for a residence at 17 Neptune Place, Massapequa, New York (the "premises") with its owner, Stanley Stuart ("Stuart"). The Mathons allege that they had a verbal agreement with Stuart to purchase the premises for $200,000.00 and to commence repairs at their own expense upon moving in. The Mathons commenced residing at the premises in November of 1992, relocating from New Jersey.

The plaintiffs allege that much time, trouble and expense was involved in the move. However, those facts are irrelevant to the Marine Midland defendants, the Aaron defendants and the Shapiro defendants because there is no claim that those defendants had anything to do with the original lease transaction. While Stuart is named as a defendant, it is not claimed that Stuart was a member of the alleged conspiratorial RICO enterprise.

Shortly after the Mathons moved to the premises, a storm caused damage and flooding. The plaintiffs contend that appliances, furniture, floors, the heating and electrical

systems, windows and doors, among other things, were damaged. The plaintiffs allegedly undertook repairs on their own because of Stuart's failure to respond to their complaints. They allege that they spend $14,000.00 to repair the premises. The plaintiffs annexed to the Amended Complaint a letter dated February 8, 1994 from them to Marine Midland Bank wherein the plaintiffs state, "[i]n fact, Mr. Stuart's fraudulent representations cost us over $14,000.00." *See* Exhibit "E" annexed to Amended Complaint.

The Mathons repeatedly refer to this $14,000.00 figure in the Amended Complaint and conclude that they were mislead and induced into spending it. The Court notes some confusion or contradiction regarding this issue in the Amended Complaint. It does not follow that the Marine Midland, Aaron and/or Shapiro defendants could have induced the plaintiffs to spend $14,000.00 to repair the premises if the plaintiffs made the $14,000.00 expenditure before they had contact with the Marine Midland, Aaron and/or Shapiro defendants.

### I. The Aaron defendants—February, 1993 to October, 1993

The Aaron defendants served as legal counsel to Marine Midland in a foreclosure action against Stuart. The Mathons' first contact by phone with the Aaron defendants was in February of 1993 upon receipt of a 'Notice of motion for judgment of foreclosure and sale.' The plaintiffs allege that six phone calls in the course of one week were made to them by the Aaron defendants. The substance of these calls is alleged by the plaintiffs to be that: 1) the Mathons should not pay Stuart any more rent; 2) when Marine Midland Bank gets title to the premises as a result of the foreclosure action, it would be, in the plaintiffs' words, "more desireous [sic] for the banks to sell the house to the Mathons since the Mathons were living there and maintaining the property at great expense."

The Mathons allege that at some unspecified time, apparently in the Spring of 1993, the Aaron defendants told the Mathons that "because of the expenses they incurred relating to this house after any forclosure [sic]

Action, they should not worry, since they are now 'Junior Lienors.'" *See* Compl. ¶ 67.

One more call from the Aaron defendants is specifically set forth. It apparently occurred in the Spring of 1993, and allegedly, in substance, advised the Mathons not to pay rent to Stuart. No specific calls are set forth in the Amended Complaint after the ones allegedly made in the Spring of 1993, but the plaintiffs claim that they spoke with the Aaron defendants by phone on various occasions until October, 1993, and were assured by the Aaron defendants that the house and any improvements they made to the house would eventually be their own property.

The plaintiffs allege that the Aaron defendants asked them to write a letter that would be forwarded to Marine Midland by the Aaron defendants. That letter is dated October 1, 1993, and is annexed as Exhibit "C" to the Amended Complaint. The letter seems to set forth the terms of purchase that the Mathons understood would be available or that they desired, as opposed to any terms that Aaron represented would be available. The Aaron defendants are not named in the Amended Complaint in the events that are described as occurring after October 1, 1993.

### II. The Marine Midland defendants—October, 1993 to February, 1994

In October, 1993, the Mathons began discussions regarding purchase and sale of the property with the Marine Midland defendants directly. The plaintiffs allege that between October, 1993, and February, 1994, they were assured "on an ongoing basis" by Marine Midland that they would "own the house."

The plaintiffs allege that the Marine Midland defendants phoned the Mathons to advise them that appraisals and inspections were needed and that the plaintiffs cooperated with the bank in that respect. There is no allegation that the Mathons, rather than the bank, paid for these appraisals and inspections.

The plaintiffs allege that Marine Midland Bank, on February 8, 1994, asked the Mathons by phone to "recap" the phone conversations and agreed on terms in a letter. The

letter that the plaintiffs allege was written in response to that conversation is addressed to Duane Leonard of Marine Midland Bank and signed by Hank Mathon and Sheila Mathon. The letter is annexed to the Amended Complaint as Exhibit "D." The letter recites that there will be 100% financing by the bank. The plaintiffs complain that a written contract later sent to them by the Marine Midland Bank varied the terms to which the parties allegedly verbally agreed as recited in the Mathon's February 8, 1994, letter.

### III. The Shapiro Defendants—November, 1993 to May, 1994

The Shapiro defendants, another law firm that represented Marine Midland Bank, entered the picture in November of 1993, when an eviction notice prepared by them was left at the premises. The Mathons called the Shapiro defendants, who allegedly assured them they should not worry about the eviction notice and asked them to write a letter stating that they were interested in purchasing the property. That letter is annexed to the Amended Complaint as Exhibit "E."

Three letters regarding the purchase and sale agreement were sent to the Mathons by the Shapiro defendants during the period between February, 1994, and May, 1994. These letters constitute the alleged mail fraud. One letter dated February 23, 1994 accompanied a contract for purchase and sale of the premises, which required a 10% down payment. The next letter, which is dated March 18, 1994, states that the contract terms were firm and sets a March 31, 1994, expiration date of the offer to sell. The final letter, dated May 3, 1994, states that the bank is no longer interested in selling the property to the Mathons.

A letter from the Mathons to the Shapiro defendants dated March 1, 1994, reflects negotiating efforts regarding the terms of the purchase and discusses the following: 1) a lower purchase price if a down payment is required; 2) the possibility of a certificate of occupancy problems or violations that might have to be corrected if another lender was involved; 3) the Mathons' willingness to pay $240,000.00 for the house "as is" and release the bank from past and present liabilities if the bank holds the mortgage for 5 years. The Court notes that communications regarding the house all refer to purchase and sale in an "as is" condition.

The Amended Complaint alleges that the bank's demand of a 10% down payment for the house is a "strong armed tactic" to "fraudulently attempt to steal $24,000.00 of the Mathons' down payment as well as other monies invested in the house by the Mathons." *See* Amended Compl. ¶ 96. According to the Amended Complaint, "this was done with great malice and intent in a conspiratorial scheme to defraud the Mathons." *Id.*

The plaintiffs relate that they hired legal counsel in March of 1993, with regard to the purchase of the premises and were advised to research the certificate of occupancy for the house. They allege that they discovered at that time that the premises had a certificate of occupancy covering less than half of the actual premises. The Amended Complaint alleges that the defendants knew at all times that the house lacked proper certification for occupancy. However, the Mathons' letters reflect that the agreement with the bank was to purchase the premises "as is." The plaintiffs allege that the lack of certification meant financing problems would arise and that the bank was aware of those problems.

The plaintiffs state that during the month of March, 1994, an eviction proceeding was commenced in New York State Supreme Court by the Marine Midland defendants, whose legal counsel in that proceeding was the Shapiro defendants. The Mathons state that they were assured by the Shapiro defendants on March 24, 1994, that the eviction proceedings would not effect them, because of their prospective purchase of the premises. This latter statement appears to the Court to be a statement of opinion, not a statement of fact.

The Mathons name as a defendant Dominick Vinceslio, the process server who came to the premises to serve eviction papers in March, 1994, to the owner of the premises. As to this defendant, the plaintiffs allege certain improprieties with regard to the service of the papers.

## PROCEDURAL HISTORY

The plaintiffs commenced this civil RICO action on or about May, 10, 1994. On or about June 20, 1994 an amended complaint was filed and sent via certified mail to all defendants whose addresses were known. At that time the plaintiffs also sent, via certified mail, a request for waiver of service of summons. The plaintiffs state that on July 25, 1994 they received a written waiver of service from the Shapiro defendants. On July 12, 1994 an answer to the Amended Complaint was filed with the Court by the Aaron defendants. Apparently, the other defendants did not respond to the Amended Complaint.

On September 29, 1994, the plaintiffs filed a notice of motion for service pursuant to Rule 4, seeking service by the United States Marshals at the cost of the defendants. The plaintiffs claim that they withdrew that motion because the Marine Midland defendants' attorney represented to the Mathons on October 20, 1994 that he would accept service on behalf of the Marine Midland defendants. That attorney thereafter appeared at a hearing before United States Magistrate Judge Michael L. Orenstein on October 27, 1994.

On or about November 3, 1994, the plaintiffs filed a notice of motion to enter default judgment allegedly because they had not received a waiver of service from the Marine Midland defendants. The Court declined to enter a default judgment based on evidence that the defendants were attempting to move or answer in the action.

## DISCUSSION OF THE PLAINTIFFS' MOTIONS TO ENTER DEFAULTS

### I. As to the Marine Midland Defendants

Fed.R.Civ.P. 4(d) is a provision by which a plaintiff may seek to have the defendant waive formal summons service. The rule states that defendants have a "duty to avoid unnecessary costs of service summons" and sets forth formal requirements for the notice and request for waiver. As a consequence of failure by a defendant to comply with such a request, "the court shall impose the costs subsequently incurred in effecting service on the defendant unless good cause for the failure be shown." Fed.R.Civ.P. 4(d)(2).

The effect of this rule is to shift the cost of service to a defendant who does not agree to waive formal service. It is clear from the plain language of the rule as well as the commentary to the rule that absent a waiver from the defendant, service must be effected in a formal manner in order to bring the defendant under the Court's jurisdiction.

Here, it is alleged that the Marine Midland defendants gave verbal assurance that they would accept service on or about October 20, 1994. On November 4, 1994, the law firm of Cullen & Dykman served a notice of appearance on behalf of Marine Midland Bank, N.A., Duane Leonard, and Marine Midland Mortgage Corp., annexed to which is acknowledgment of service on those defendants as of that date. The plaintiffs' notice of motion for entry of default judgment is dated November 3, 1994. Even if the Marine Midland defendants are deemed to have accepted service on October 20, 1994, the plaintiffs' default motion was filed prior to the expiration of the time in which the Marine Midland defendants could respond to the Amended Complaint.

The plaintiffs argue that the Marine Midland defendants have been uncooperative and misleading regarding the return of waivers of service so that "entry of default judgment under special circumstances" is appropriate. The Court does not agree that the defendants behavior has been so egregious as to justify entry of default.

The defendants actual acknowledgement of service is dated November 4, 1994. The Marine Midland defendants served and filed a notice of motion to dismiss the Amended Complaint against them on or about November 3, 1994. The Court finds that the Marine Midland Bank, N.A., Duane Leonard and Marine Midland Mortgage Corp. are not in default. Accordingly, the plaintiffs' motion to enter default judgment against them is denied.

The Court notes that to date, the named defendant Hongkong and Shanghai Bank Corp., Ltd. has not waived service and has not been formally served in this action.

Also, the named defendant Laura Glulseppotti, a former Marine Midland employee, has not been served in this action.

## II. As to the Shapiro defendants

The plaintiffs first moved for entry of a default judgment against the Shapiro defendants on or about September 30, 1994, three days after their time to answer had expired. The Shapiro defendants first attempted to respond to the Amended Complaint on or about October 11, 1994, by making a motion to dismiss, which was unsuccessful, as explained below. The default period at most spans only a matter of weeks.

The Shapiro defendants signed waivers of summons service on July 25, 1994. According to Fed.R.Civ.P. 4(d)(3):

A defendant that, before being served with process, timely returns a waiver so requested is not required to serve an answer to the complaint until 60 days after the date on which the request for waiver of service was sent. . . .

Accordingly, the Shapiro defendants' time to answer or otherwise move with respect to the Amended Complaint expired on September 26, 1995. The plaintiffs consented to extend the Shapiro defendants time to answer the Amended Complaint until September 27, 1995. The plaintiffs served and filed a notice of motion for entry of default judgment against the Shapiro defendants on or about September 30, 1994.

The Court returned the plaintiffs' motion papers under cover letter dated October 5, 1994 because they did not include proof of service. Upon resubmission of the motion papers, the Court thereafter advised the Mathons, by letter dated October 26, 1994, that no default would be entered when it appeared that the defendants were attempting to appear in the action.

The Shapiro defendants prepared and submitted to the Court, motion papers to dismiss the Amended Complaint. These motion papers were returned to the defendants under cover letter from the Court dated October 19, 1994 explaining that the papers failed to conform to Judge Spatt's individual rules. The papers were resubmitted and again rejected by the Court under cover letter dated October 26, 1994, which explained that the record revealed a default. The Shapiro defendants served and filed a cross motion to be relieved of their default on or about November 10, 1994.

Fed.R.Civ.P. 55(c) provides:

For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b).

Relief from default under Rule 55(c) is to be granted at the discretion of the court upon consideration of the individual circumstances of the case and the credibility and good faith of the parties. *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993). The Second Circuit strongly prefers dispute determination on the merits and directs district courts to resolve any doubts regarding vacatur of default in favor of a trial on the merits. *Enron Oil, supra*, at 96, 98.

Rule 55(c) provides that default may be set aside for "good cause" in accordance with Rule 60(b). In determining a motion to vacate a default the Court focuses on three considerations with regard to the meaning of "good cause." These factors are (1) the willfulness of the default; (2) potential prejudice to the adversary; and (3) the presentation of a meritorious defense. *Enron Oil, supra*, at 96.

### A. Willfulness

The Shapiro defendants explain that inadvertence resulted in their motion being filed two weeks after their time to answer the Amended Complaint had expired. They state in affidavits annexed to their moving papers that preparation of their motion to dismiss began in early September and that they spoke with the plaintiffs at that time to secure their agreement to a brief extension of the time to answer.

The Shapiro defendants admit several mistakes in their understanding of federal motion procedure. Specifically, they claim that they initially understood that the motion would be heard by the magistrate judge to whom the case was assigned. Further, they

allege that they mistakenly understood that adjournment of an introductory conference before Judge Orenstein from August 30, 1994 until October 27, 1994 meant that their time to answer the Amended Complaint was extended until that time.

The Shapiro defendants initially submitted their motion to dismiss to the Court on or about October 11, 1994, two weeks after their time to answer or otherwise respond to the Amended Complaint had expired. Although the papers were returned because they did not conform to this Court's individual rules, the Shapiro defendants' conduct clearly indicated to all parties that they intended to appear and defend the lawsuit. The Court finds the errors made by the Shapiro defendants do not rise to the level of a willful default.

### B. Prejudice

■ It cannot be said that a delay in the proceedings of several weeks prejudices the plaintiffs. Furthermore, delay alone does not constitute prejudice. *Enron Oil, supra,* at 98. A brief delay is not a critical factor at this early stage of the proceedings, when some of the defendants have only recently accepted service and discovery has not commenced. Real prejudice is evidenced by the loss of evidence, the unavailability of witnesses or roadblocks to discovery. *See Davis v. Musler,* 713 F.2d 907, 916 (2d Cir. 1983). The Court finds that the plaintiffs have suffered no prejudice as a result of this brief default.

### C. Meritorious defense

■ Even where delay in filing an answer constitutes willfulness, relief under Rule 60(b) is granted where a meritorious defense is presented. *See Wagstaff-El v. Carlton Press Co.,* 913 F.2d 56 (2d Cir.1990), *cert. denied,* 499 U.S. 929, 111 S.Ct. 1332, 113 L.Ed.2d 263 (1991). A meritorious defense is established by Rule 55 standards by setting forth denials and defenses in an answer. *Meehan v. Snow,* 652 F.2d 274, 277 (2d Cir. 1981). For reasons discussed in detail below, the Court finds that the Shapiro defendants present a meritorious defense to the Amended Complaint.

The Court agrees with the Shapiro defendants that it would be manifestly unjust to allow the plaintiffs to enter a default judgment in a RICO case, especially considering the availability of treble damages and attorneys fees, without permitting an opportunity to defend on the merits of the claims. The Court finds that extreme sanction of default is inappropriate in this case. Accordingly the plaintiffs' motion for entry of default judgment against the Shapiro defendants is denied and the said defendants' default is vacated.

### DISCUSSION OF THE MOTIONS TO DISMISS

#### I. Rule 12(b)(6) standard

On a motion to dismiss for failure to state a claim, "the court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' ". *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir. 1985) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *see also IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052–53 (2d Cir. 1993), *cert. denied,* ——— U.S. ———, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994). The Second Circuit stated that in deciding a Rule 12(b)(6) motion a Court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken". *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993); *see also Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 593–94 (2d Cir.1993) (citing *Samuels,* 992 F.2d at 15).

■ It is not the Court's function to weigh the evidence that might be presented at a trial, the Court must merely determine whether the complaint itself is legally sufficient, *see Goldman,* 754 F.2d at 1067, and in doing so, it is well settled that the court must accept the allegations of the complaint as true, *see LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 14 (2d Cir.1989), *cert. denied,* 493 U.S. 1022, 110

S.Ct. 723, 107 L.Ed.2d 743 (1990), and construe all reasonable inferences in favor of the plaintiff. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1099 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1643, 104 L.Ed.2d 158 (1989).

The Court is mindful that under the modern rules of pleading, a plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), and that "[a]ll pleadings shall be so construed as to do substantial justice". Fed.R.Civ.P. 8(f).

In addition, because the plaintiffs are proceeding without an attorney, the Court must give wide latitude to the papers filed by the *pro se* litigants. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (*pro se* papers are to be held "to less stringent standards than formal pleadings drafted by lawyers"). The Court recognizes that it must make reasonable allowances so that a *pro se* plaintiff does not forfeit his rights by virtue of his lack of legal training. *Seagrave Corp. v. Vista Resources, Inc.,* 710 F.2d 95 (2d Cir.1983). However, the Court is also aware that " 'self representation does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Id.* (quoting *Birl v. Estelle,* 660 F.2d 592, 593 (5th Cir.1981)).

The Aaron defendants, the Midland Marine defendants and the Shapiro defendants all move to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6), 9(b), and 12(b)(1). From this point forward these three groups of defendants will be referred to collectively as the "defendants." Federal jurisdiction in this action is based on alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. The defendants assert that: 1) the Amended Complaint fails to state a RICO claim upon which relief can be granted; 2) the Amended Complaint fails to plead fraud with particularity; and 3) in the absence of the RICO claim, there is no jurisdictional basis for the pendant state claims.

## II. Pleading a civil RICO cause of action

Under civil RICO it is unlawful to participate in the conduct of an enterprise's affairs through a pattern of racketeering or to conspire to violate any of the substantive provisions of Section 1962. *See* 18 U.S.C. § 1962(c) & (d). Section 1964(c) of Title 18 creates a private right of action for individuals to enforce the RICO statute.

The threshold pleading requirements of a private action under Section 1962 of the RICO statute were set forth in *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir. 1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984), as follows:

> To state a claim for damages under RICO a plaintiff has two pleading burdens. First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as "criminal RICO." In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.... Plaintiff must allege adequately defendant's violation of section 1962 before turning to the second burden—*i.e.,* invoking RICO's civil remedies of treble damages, attorneys fees and costs.... To satisfy this latter burden, plaintiff must allege that he was "injured in his business or property *by reason of* a violation of section 1962" (*Moss, supra,* 719 F.2d at p. 17 [citations omitted] ).

The Court will now address the elements of the RICO claims to determine whether the pleading requirements are satisfied.

### A. Enterprise

An "enterprise" within the meaning of the RICO statute includes any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This enterprise is generally described as "a *group of persons* associated together for a common

purpose of engaging in a course of conduct." *Procter & Gamble,* 879 F.2d at 15 (emphasis in original). The existence of an enterprise is proven by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). The term "enterprise" encompasses both legitimate and illegitimate enterprises. *Id.* The Supreme Court recently held that "one must participate in the operation or management of the enterprise itself" to be liable as part of a RICO enterprise. *Reves v. Ernst & Young,* —— U.S. ——, ——, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993). The high court explained that "participate" in the context of RICO has a narrower meaning than "aid and abet," and that *"some* part in directing the enterprise's affairs is required." *Id.* at ——, 113 S.Ct. at 1170.

The Amended Complaint alleges an "enterprise" between creditors of the plaintiffs' defaulting landlord (the Marine Midland defendants), the law firms retained by the creditors, and the employees of those law firms. The defendant law firms (Aaron defendants and Shapiro defendants) draw the Court's attention to two cases from the Eastern and Southern districts of New York, that found, under the *Reves* "operation or management" test, that law firms carrying out their clients' directives do not incur RICO liability even if they intentionally assist a client's fraudulent scheme. *See Morin v. Trupin,* 835 F.Supp. 126 (S.D.N.Y.1993) (dismissing RICO claims against attorneys because "providing legal advice and legal services does not constitute participation sufficient to ground allegation of § 1962(c)"); *Biofeedtrac, Inc. v. Kolinor Optical Enterprises,* 832 F.Supp. 585 (E.D.N.Y.1993) (granting summary judgment to defendant lawyers as to RICO liability where defendant lawyers provided legal advice and services, even where the intentionally assisted a fraudulent scheme by the clients to defraud); *see also Nolte v. Pearson,* 994 F.2d 1311 (8th Cir.1993) (affirming district court's directed verdict for defendant lawyers because no evidence suggested that the attorneys participated in the operation or management of the enterprise).

The above cases lead to the conclusion that attorneys do not incur RICO liability for the traditional functions of providing legal advice and services. However, the cases do not foreclose the possibility of an attorney or law firm maintaining a operational or managerial position in a RICO enterprise. Because the Court must construe all allegations in favor of the plaintiff in reviewing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court determines for the purposes of this motion that the Amended Complaint sufficiently to pleads a "RICO enterprise." *See LaBounty,* 933 F.2d at 123.

Because the First Amended Complaint properly sets forth the required "enterprise", the Court must now examine whether the Amended Complaint sets forth the required "pattern" of racketeering activity.

**B. A pattern of racketeering activity**

A "pattern" requires at least two acts of "racketeering activity", occurring within ten years of each other. *See* 18 U.S.C. § 1961(5). The term "racketeering activity" refers to the predicate acts necessary to sustain a RICO claim and include mail fraud and wire fraud. *See* 18 U.S.C. § 1961(1). Those predicate acts must be crimes under state or federal law. *United States v. Angelilli,* 660 F.2d 23 (2d Cir.1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657, *rehearing denied,* 456 U.S. 939, 102 S.Ct. 1998, 72 L.Ed.2d 460 (1982).

Both the Supreme Court and Second Circuit have held that an allegation of two acts of "racketeering activity", without more, is not sufficient to establish a pattern. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 238–44, 109 S.Ct. 2893, 2900–93, 106 L.Ed.2d 195 (1989); *United States v. Indelicato,* 865 F.2d 1370, 1381 (2d Cir.) *(en banc ), cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). In order to constitute a "pattern" of racketeering activity, the predicate acts must be related and constitute a threat of continued racketeering activity and this determination is to be made on a case-by-case basis. *H.J. Inc.,* 492 U.S. at 238–44, 109 S.Ct. at 2900–93; *see also United States*

*v. Alkins,* 925 F.2d 541, 551 (2d Cir.1991) (predicate acts must be related and amount to or pose a threat of continued criminal activity). In addressing the determination about a "pattern" of racketeering activity the Second Circuit noted that "[a]n interrelationship between acts, suggesting the existence of a pattern, may be established ... [by] proof of their temporal proximity, or common goals, or similarity of methods, or repetitions." *Indelicato,* 865 F.2d at 1382.

The Court will first address the predicate acts alleged by the plaintiffs and then determine whether those acts properly plead a pattern.

## C. Predicate acts of mail fraud and wire fraud

In the present case, the plaintiffs allege that certain telephone conversations and letters constitute predicate acts of mail and wire fraud.

Specifically, the plaintiffs allege that they were advised by telephone that it would be possible for them to purchase the premises following foreclosure. As recited above, as to some of the alleged calls, the Mathons identify dates that these alleged conversations took place, the names of the persons with whom they spoke and the subjects of the conversations. The plaintiffs allege that during these phone calls the defendants knowingly made false representations to induce the plaintiffs to invest money to repair and maintain the premises. They also allege that three letters regarding a contract for sale for the premises constitute mail fraud by the defendants.

The plaintiffs further allege that their investment unjustly enriched the defendants. However, the plaintiffs admit that during the period in question they were told by the defendants not to pay rent. The plaintiffs stated on the record of the November 18, 1994 hearing in this matter that they continue to live in the premises without paying rent. At oral argument on January 13, 1995, the Mathons conceded that they have not paid rent since about July of 1993 and have benefited in the sum of approximately $27,-000.00, which represents $1,500.00 per month for eighteen months.

### i. Mail fraud

In discussing the predicate act of mail fraud, the Second Circuit has stated that

[a]llegations of mail fraud must be made with the particularity required by Federal Rule of Civil Procedure 9(b) ... Pursuant to this higher pleading standard, the "complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." ... Plaintiffs asserting mail fraud must also identify the purpose of the mailing within the defendant's fraudulent scheme.

*McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992) (citations omitted).

In reviewing the allegations of a pattern of racketeering activity with regard to mail fraud, the Court notes that the plaintiffs annex to their Amended Complaint three letters from the Shapiro defendants to substantiate this claim. The first is a letter dated February 23, 1994, which indicates that an original and three copies of a contract of sale for the premises were transmitted with the letter. The letter advises that the contracts constitute an offer and that if the contracts are not signed and returned with a 10% deposit within ten days, the property will be shown to other prospective purchasers. The Court notes that the documents referred to in this letter appear to be standard form residential real estate sale contracts.

The second letter is dated March 18, 1994, and it extends the offer to sell the premises until March 31, 1994 at 5:00 p.m. This letter also relates that 1) the purchase price of $240,000.00 is firm; 2) the contract is "as-is," explaining that work required to obtain financing, such as obtaining certificates of occupancy is the buyer's responsibility; and 3) Marine Midland declines to offer short term financing for the premises. A final letter dated May 3, 1994, more than 60 days after the contract was initially sent to the plaintiffs, formally notifies the plaintiffs that the

Marine Midland Bank, N.A. is no longer interested in selling the premises to them.

In the Court's view, none of these letters constitute a fraudulent misrepresentation. Stated simply, the defendants said they would sell the premises to the plaintiffs and they offered to do so. Even under the most liberal construction imaginable these letters do not constitute mail fraud. They are the usual and standard communications relating to the negotiation of a residential real estate sale transaction. The Court finds that with regard to these letters, the Amended Complaint does not allege mail fraud. *See United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir.1986), *aff'd in part*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

### ii. Wire fraud

With regard to the plaintiffs' reliance on wire fraud as predicate criminal acts, the Amended Complaint sets forth telephone conversations in which the defendants allegedly: 1) assured the plaintiffs that a purchase and sale agreement could be reached; 2) assured the plaintiffs that they were "junior lienors" with respect to the expenses they incurred in repairing and maintaining the premises; 3) advised the plaintiffs not to pay rent; 4) assured the plaintiffs that foreclosure and eviction proceedings should not adversely effect the plaintiffs; 5) stated certain terms regarding the sale of the premises by telephone conversation and then varied those terms in the written contract that was offered.

"The elements of wire fraud are 1) a scheme to defraud and 2) use of interstate wire communication to further that scheme." *United States v. Lemire*, 720 F.2d 1327 (C.A.D.C.1983) (noting that the requisite elements of wire fraud [18 U.S.C. § 1343] are identical to those of mail fraud [18 U.S.C. § 1341] ). As recited previously, the plaintiffs do allege telephone calls on specific dates, identify the party with whom they spoke, and also allege what the plaintiffs believe to be the purpose of the call as part of the alleged scheme.

The Mathons claim that the defendants gave them false and misleading information regarding their ability to purchase the premises and that they relied on that information

to their detriment. Allegedly, the defendants promised 100% financing for the house, and relying on that representation, the plaintiffs passed up other purchase opportunities at a time of low interest rates. In addition, the plaintiffs allege that the defendants promised to sell them the premises when the defendants knew that the premises did not have a proper certificate of occupancy.

The Court notes that throughout the parties' communications, the sale of the house is referred to in an "as is" condition. The Court further notes that a March 18, 1993 letter from the Shapiro defendants states, "[t]he contract is 'As–Is,' any work required to obtain the financing, *example c/o's*, electrical, etc. is your responsibility." (emphasis supplied).

The Mathons also contend that the statement by the Aaron defendants that the Mathons would be "junior lienors" constitutes wire fraud. The Court disagrees. Under New York law,

[a]n equitable lien may result from proof of the expenditure of money in the improvement of real property by a person in a confidential relationship to the owner, or proof of an intention that the premises be held as a security for the obligation. For example, where a relation of confidence has been abused, and a person has never had title to the property, but has expended money in its improvement on the basis of an oral promise to convey, which money does not constitute the entire consideration for the purchase of the interest claimed, that person is entitled to an equitable lien thereon for the amount expended.

75 N.Y.Jur.2d § 20, *Liens* (Advancement for improvement or purchase of real property) (citations omitted); *see also* § 49 (Enforcement of equitable liens). Accordingly, it is this Court's view that the statement by the Aaron defendants that the Mathons had an equitable lien on the premises is not a fraudulent representation.

The defendants draw the Court's attention to the requirement that wire fraud be interstate in order to state a RICO claim. The Court notes that it has been held that intrastate calls do not satisfy the jurisdiction-

al prerequisite for the wire fraud statute as a predicate RICO act. *See e.g., McCoy v. Goldberg,* 748 F.Supp. 146 (S.D.N.Y.1990); *see also United States v. De Biasi,* 712 F.2d 785 (2d Cir.), *cert. denied,* 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983) (the "interstate" element was satisfied in a counterfeit credit card scheme by calls made out-of-state by merchants for authorization of charges, even though the conspirators made authorization calls only within New York).

The plaintiffs do not specifically allege any calls made outside of the state of New York. They do allege that Marine Midland is engaged in interstate commerce and name a foreign affiliate of Marine Midland, namely Hongkong and Shanghai Bank Corp., Ltd., as a defendant. At this point, accepting the allegations of the Amended Complaint as true, the Court finds that this element is sufficiently plead.

### D. Related and continuous acts

The Supreme Court explained, "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity.... Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 242, 109 S.Ct. 2893, 2900, 2902, 106 L.Ed.2d 195 (1989) (emphasis in original).

 The relevant time period, with regard to the allegations of wire and mail fraud as to all of the defendants combined, is approximately fourteen to fifteen months. The alleged periods of participation with regard to each group of defendants is as follows: 1) the Amended Complaint alleges that the Aaron defendants conversed with the Mathons by phone at least eight times between the months of February and October, 1994; 2) the Amended Complaint alleges that the Marine Midland defendants conversed with the Mathons "on an ongoing basis" by phone between the months of October, 1993 and February, 1994; and 3) the Shapiro defendants allegedly conversed by phone with the Mathons at least four times and wrote three

letters to the Mathons between the months October, 1993 and May, 1994.

The alleged acts during the period beginning in February, 1993 to May, 1994, as to all three sets of defendants, consist of three letters and perhaps fifteen or twenty phone calls. As stated previously, some of the phone calls are set forth with specificity, and many are alleged in general terms. The Second Circuit recently discussed RICO's "pattern" element in terms of the nature of the alleged acts and the duration of the scheme, stating:

> ... in cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering acts was short. In contrast, in cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property, the courts generally have found no threat of continuing criminal activity arising form conduct that extended over even longer periods.

*U.S. v. Aulicino,* 44 F.3d 1102, 1111–12 (2d Cir.1995). The alleged predicate acts in this case concern acts that are not inherently unlawful.

In this Court's view, the complained of acts do not constitute a pattern of criminal activity extending over a substantial period of time. *H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. at 2902. Nor do the complained of acts by their nature "project into the future with a threat of repetition." *Id.* In addition, this case involves a single transaction involving one alleged victim, albeit two persons, one real estate transaction, a limited goal, no threatened future action, and no allegation of long-term criminal conduct. The threat of continuity is not present in a situation where "the defendant had a piece of property the sale of which even if by fraudulent means, provided

a natural end to his project." *Aulicino, supra* at 1113.

This case is analogous to *Continental Realty Corp. v. J.C. Penney Co., Inc.*, 729 F.Supp. 1452 (S.D.N.Y.1990), where the court analyzed RICO's "pattern" requirement as it applied to allegations of wire and mail fraud with respect to a real estate transaction. The alleged predicate acts in *Continental Realty* transpired during a period that was in excess of a year in duration. *Id.* at 1454. The *Continental Realty* court stated:

> [d]efendants' actions were narrowly directed toward a single allegedly fraudulent goal. The scheme involved one victim . . ., one group of perpetrators . . . and a limited goal (fraud and breach of contract in one real estate transaction). If we treat the facts pleaded as alleging a closed-ended scheme, the Defendants' fraudulent acts occurred over too short a time period to constitute the "long-term criminal conduct" required by *H.J., Inc. H.J. Inc.*, [429 U.S. at 241] 109 S.Ct. at 2902 ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement"); *see Airlines Reporting Corp.* [*v. Aero Voyagers, Inc.*], 721 F.Supp. [579] at 585 [ (S.D.N.Y. 1989) ] (thirteen months are insufficient).

*Id.* at 1455. Similarly, the plaintiffs here allege a scheme of short and limited duration: 1) as to the Aaron defendants during the period of February, 1993 to October, 1993, a period of approximately eight months; 2) as to the Marine Midland defendants during the period of October, 1993 to February, 1994, a period of approximately four months; and 3) as to the Shapiro defendants during the period of November, 1993 to May, 1994, a period of approximately six months. As stated above, the total period in question, as to all of the defendants combined, spans about fourteen to fifteen months. The singular goal alleged is that of causing the Mathons to repair and maintain the subject premises, relying upon a promise to sell the property to them.

■ RICO claims based on predicate acts committed over a relatively short period of time may survive dismissal if they involve multifaceted schemes and a variety of fraud-

ulent acts. *Barsam v. Pure Tech Int., Inc.*, 864 F.Supp. 1440, 1450 (S.D.N.Y.1994) (citing *Proctor & Gamble v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 18 (2d Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990) in which five separate fraudulent schemes were alleged, and also citing *Morrow v. Black,* 742 F.Supp. 1199 (E.D.N.Y.1990), where the complaint alleged that the defendants engaged in one scheme after another). The Court notes that in limited duration, limited goal and single transaction cases such as the instant case, the following language is appropriate:

> [w]hen a RICO claim is based on a defendant's narrowly directed actions toward a single fraudulent end with a limited goal, lasting over a limited period of time, the claim usually fails. *Continental Realty Corp. v. J.C. Penney Co. Inc.,* [*supra* ]. *See also Thai Airways Int. v. United Aviation Leasing B.V.,* 842 F.Supp. 1567, 1572–73 (S.D.N.Y.1994) ("Any continuing concealment of transfer of the security deposits would not cause any additional harm . . . and would not enlarge the scope of the isolated alleged fraud."); *In re Integrated Resources Real Estate,* 850 F.Supp. 1105, 1148 (S.D.N.Y.1993) (dismissing claim based on fraud of two-month duration); *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1044 (S.D.N.Y. 1993) (six-month scheme of racketeering "inadequate to establish closed-ended continuity"); *Barrett v. United States Banknote Corp.,* 806 F.Supp. 1094, 1100 (S.D.N.Y.1992) (dismissing RICO claim based on single act of fraud committed over several months); *Mead v. Schaub,* 757 F.Supp. 319, 322 (S.D.N.Y.1991) (dismissing alleged five-year fraud made to further single scheme); *Ruby Dev. Corp. v. Charrim Dev. Corp.,* 742 F.Supp. 1213, 1216 (E.D.N.Y.1990) (dismissing single scheme which took place over a finite period of eight months); *Airlines Reporting Corp. v. Aero–Voyagers, Inc.,* 721 F.Supp. 579, 584 (S.D.N.Y.1989) ("there is insufficient threat of continuity to support a RICO cause of action where the racketeering acts involved a brief period of time, relatively few criminal acts, an uncompli-

cated scheme, few participants and few victims").

*Barsam,* 864 F.Supp. at 1450.

The Second Circuit's recent *Aulicino* decision discussed cases in which the fact situations, because of the nature and duration of the alleged predicate acts involved, were found not to pose a threat of continued criminal activity:

in *Metromedia Co. v. Fugazy,* 983 F.2d 350, 368–69 (2d Cir.1992), *cert. denied,* [—— U.S. ——] 113 S.Ct. 2445 [124 L.Ed.2d 662] (1993), which involved the sale of 80% of a business, rather than any inherently unlawful goal, we noted that the trial court's instruction to the jury that " 'a few weeks or months' might constitute a 'substantial period of time' " was erroneous. *Id.* at 369; *see also id.* (upholding RICO verdict in favor of the plaintiffs because the predicate acts of securities and bankruptcy fraud found by the jury spanned not just weeks or months but years, and the erroneous instruction was therefore harmless).

. . . .

. . . the Sixth Circuit in *Vemco, Inc. v. Camardella,* 23 F.3d 129 (6th Cir.1994), *cert. denied,* [—— U.S. ——] 115 S.Ct. 579 [130 L.Ed.2d 495] (1994), saw no threat of continuity where the alleged construction-contract fraud spanned 17 months. The court reasoned that the fraud was aimed at obtaining payment for *"one* paint system," and then "its scheme would be over." *Id.* at 134–35 (emphasis in original). *See also Thompson v. Paasche,* 950 F.2d 306, 311 (6th Cir.1991) (no threat of continuity where the defendant's goal was sale of certain land, and five-month allegedly fraudulent scheme with regard to the sale was "an inherently short-term affair").

. . . in *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771 (7th Cir. 1994), the court held that nine months was insufficient where the defendant's activity was selling and leasing equipment to the plaintiff pursuant to a vendor agreement. Though the complaint alleged that the defendant had pursued that goal by means of a fraudulent scheme the court ruled that the sales and leases constituted "a clearly

defined, discrete, and finite" project that "import[ed] no inherent threat of continuing misconduct." *Id.* at 783 (internal quotes omitted). *See also Religious Technology Center v. Wollersheim,* 971 F.2d 364, 366 (9th Cir.1992) (no threat of continuity where only goal of alleged racketeering conduct was successful prosecution of a single lawsuit); *Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 610–11 (3d Cir.1991) (no threat of continuity where there was no evidence that defendants "formed an on-going criminal association" and alleged fraudulent scheme was to obtain favorable prices from plaintiffs with regard to a single tract of land), *cert. denied,* [504 U.S. 955] 112 S.Ct. 2300 [119 L.Ed.2d 224] (1992); *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 45–47 (1st Cir.1991) (no threat of continuity where misrepresentation to plaintiffs at 25 real-estate closings spanned no more than three-to-four months); *Pyramid Securities Ltd. v. IB Resolution, Inc.,* 924 F.2d 1114, 1119–20 (D.C.Cir.) (no threat of continuity where opportunity to churn brokerage account arose only during plaintiff's three-to-four month honeymoon), *cert. denied,* [502 U.S. 822] 112 S.Ct. 85 [116 L.Ed.2d 57] (1991).

*Aulicino, supra* at 1112–13. Following the reasoning of the cases cited above by the Second Circuit, this Court finds that the acts alleged in this case do not by their nature pose a threat of continued criminal activity, nor do they extend over a substantial period of time.

The plaintiffs allege that a recently published *Newsday* article regarding Marine Midland's foreclosure of a Port Jefferson Station property demonstrates a likelihood that the defendants have defrauded other victims and will continue their allegedly fraudulent conduct in the future. *See H.J. Inc., supra.* The plaintiffs argue that they will be able to reveal details of other victims and "future harm to society" through discovery. This theory is based on conjecture and will not be considered by the Court.

**E. Civil RICO conspiracy**

The plaintiffs also allege that the defendants conspired to commit the com-

plained of acts. The essence of a RICO conspiracy is an agreement to commit the predicate acts. *See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21 (2d Cir. 1990). "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Id.* at 25 (affirming dismissal of a complaint that "does not allege facts implying any agreement involving each of the defendants to commit at least two predicate acts").

Here, the plaintiffs' conspiracy allegations are limited to descriptive phrases such as "conspiratorial acts" "conspiratorial manner," "conspiratorial method," and "conspiratorial pattern." The only paragraph of the Amended Complaint that specifically refers to a violation of 18 U.S.C. 1962(d) is ¶ 144, which states the following:

> Conspiratorial acts of racketeering activity engaged in by the defendants were willful, malicious, calculated to gain for the enterprise, persons, definite and valuable economic rewards at the expense of inflicting substantial injury upon the Mathons, all of which is prohibited activity within the meaning of 18 U.S.C. § 1962(C)(D).

The Court finds that these general and conclusory allegations do not properly plead a civil RICO conspiracy and this cause of action is dismissed as to all defendants. However, the Court cannot say at this point that it would be impossible for the plaintiffs to properly plead a cause of action under subsection 1962(d). The subject of leave to replead is discussed below.

### III. Applicability of civil RICO to this case

In this court's view, this is the type of case to which the Second Circuit referred when it stated that it had no "disposition ... to countenance fanciful invocations of the draconian RICO weapon in civil litigation." *See Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (2d Cir.1990), *cert. denied,* — U.S. —, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992); *see also United States v. Huber,* 603 F.2d 387, 395–96 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980) ("RICO poses a danger of abuse [through] attempts to apply the statute to situations for which it was not primarily intended.").

█ Other circuit courts have reached the same conclusion. *See e.g., Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147, 1150 (10th Cir.), *cert. denied,* 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989) (RICO § 1962(a) should not be expanded beyond the terms of its own language); *United States v. Anderson,* 626 F.2d 1358, 1365 n. 11 (8th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981) (expansion of RICO beyond what Congress intended is judicial legislation). The purposes of civil RICO liability do not include deterrence of unlawful acts, not rising to criminal liability, for which there are state and common law remedies. *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21 (2d Cir.1990).

In addition, this Court agrees that alleged RICO violations must be reviewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations. *See Noland v. Gurley,* 566 F.Supp. 210 (D.C.Colo.1983) (citing *Van Schaick v. Church of Scientology of California, Inc.,* 535 F.Supp. 1125 (D.Mass.1982); *Adair v. Hunt International,* 526 F.Supp. 736 (N.D.Ill.1981); *Waterman S.S. Corp. v. Avondale Shipyards, Inc.,* 527 F.Supp. 256 (E.D.La.1981); *Kleiner v. First National Bank of Atlanta,* 526 F.Supp. 1019 (N.D.Ga. 1981); *Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co.,* 527 F.Supp. 206 (E.D.Mich.1981). See also *Reynolds v. East Dyer Dev. Co.,* 882 F.2d 1249 (7th Cir.1989) (not all conduct that may constitute sharp dealing or even unethical conduct is a scheme to defraud within the meaning of RICO); *United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980) (the RICO statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract); *D.E.J.S.A. Corp. v. Shooster,* 1994 WL 285036 (E.D.Pa.1994) (acts by a defendant that may give rise to contract claims do not necessarily constitute

wire or mail fraud); *Seville Indus. Machinery Corp. v. Southmost Machinery Corp.*, 567 F.Supp. 1146 (D.N.J.1983) (civil RICO provisions were not enacted for purpose of imposing federal liability for state business fraud claims).

## IV. Conclusions as to motions to dismiss

For the reasons stated above, the Court finds that the Amended Complaint fails to state a cause of action under 18 U.S.C. § 1962(c) or § 1962(d) upon which relief can be granted against Philip Irwin Aaron, P.C., Paul Rudden, Marine Midland Bank, N.A., Marine Midland Mortgage Corp., Duane Leonard, Shapiro & Kreisman, Gerald Shapiro, David S. Kreisman, Dominick Vinceslio, Felicia Renee Durkin, Karen Karates, Neil Gross and Frank Culhane. The Amended Complaint fails to allege facts, which if proven would establish that these defendants committed two or more predicate RICO acts in a pattern of racketeering that are related and pose a threat of continued criminal activity. Accordingly, the entire Amended Complaint is dismissed against these defendants as a matter of law.

## V. Pendant state claims

■ The Amended Complaint includes common law causes of action for fraud, misrepresentation, breach of contract, harassment, intentional infliction of emotional distress and legal malpractice as well as violations of the New York consumer fraud statute. The civil RICO claims, which are now dismissed, formed the federal jurisdictional ground in this case.

"Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The Court declines to exercise pendant jurisdiction over the plaintiffs' pendant state claims in the absence of a federal claim. *See, e.g., Block v. First Blood Assoc.*, 988 F.2d 344, 351 (2d Cir.1993); *Morse v. University of Vermont*, 973 F.2d 122, 127 (2d Cir.1992).

## VI. Failure to timely serve defendants

Fed.R.Civ.P. 4(m) provides,

If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice....

The Court noted, and the plaintiffs confirmed at oral argument on January 13, 1995, that several defendants appearing in the caption of the case have not yet been served, namely, Laura Glulseppotti, Hongkong and Shanghai Bank Corp., Ltd. and Stanley Stuart. The Amended Complaint was filed on or about June 20, 1994. The Court gave notice to the plaintiffs of its intent to dismiss this action against the defendants named in this paragraph because they have not been properly served. Accordingly, the Court now dismisses the Amended Complaint without prejudice against these three defendants because they have not been brought within the Court's jurisdiction by service of process within the designated period of time.

## VII. Leave to replead

Rule 15(a) provides that "leave [to amend a pleading] shall be freely given when justice so requires." *See also Gumer v. Shearson, Hammill & Co.*, 516 F.2d 283, 287 (2d Cir. 1974). Only "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ... [or] futility of the amendment" will serve to prevent an amendment prior to trial. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *accord Health–Chem Corp. v. Baker*, 915 F.2d 805 (2d Cir.1990); *Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co.*, 657 F.Supp. 136, 141 (E.D.N.Y. 1987).

■ Leave to amend may be denied if the amendment would be futile. *Foman*, 371 U.S. at 182, 83 S.Ct. at 230; *In re American Express Co.*, 39 F.3d 395, 131 (2d Cir.1994); *John Hancock Mutual Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994); *Ruffolo v. Oppenheimer & Co., Inc.*, 987 F.2d 129, 131 (2d Cir.1993). The Court

finds that repleading would be futile as to the substantive RICO claims because the facts alleged by the plaintiffs, taken as true, will not support a finding against any of the defendants with regard to commission of two predicate racketeering acts. Further, these acts are not in a "pattern" and do not "amount to or pose a threat of continued criminal activity." *See H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900.

However, at this time, the Court cannot determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy by specifically alleging "facts implying [an] agreement involving each of the defendants to commit at least two predicate acts." *See Hecht*, 897 F.2d at 25. Therefore leave to replead is granted as to a cause of action under 18 U.S.C. 1962(d) only. Leave to replead the conspiracy claims is granted as to the following defendants only: Marine Midland Bank, N.A., Marine Midland Mortgage Corp., Duane Leonard, Philip Irwin Aaron, P.C., Paul Rudden, Shapiro & Kreisman, Gerald Shapiro, David S. Kreisman, Karen Karates, Neil Gross, Frank Culhane, Felicia Renee Durkin and Dominick Vinceslio. Any new allegations must conform to pleading standards for a civil RICO conspiracy.

The Court notes with approval Judge Leisure's thoughtful comments in *Spier v. Erber*, 1990 Transfer Binder, Fed.Sec.L.Rep. (CCH), ¶ 95,287, 1990 WL 71502 (S.D.N.Y. 1990):

> it has become an all too common practice for litigants granted leave to replead to make only minor changes in the original complaint based on an overly restrictive reading of the dismissing court's order, prompting a second motion to dismiss. An amended complaint which fails to replead with sufficient particularity after a finding of lack of specificity may well be regarded by the Court as a frivolous filing in violation of Fed.R.Civ.P. 11. Conversely a renewed Rule 9(b) motion after an adequate and thorough repleading can also be viewed as frivolous.

*Id.*

## CONCLUSION

Having reviewed of the papers submitted in support of and in opposition to this motion as well as the case file, having heard the parties' respective positions at oral argument on December 9, 1994 and January 13, 1994 and for the foregoing reasons, it is hereby

**ORDERED,** that the Court denies the plaintiffs' motions to enter default judgments against the defendants Marine Midland Bank, N.A., Hongkong and Shanghai Bank Corp., Ltd, Duane Leonard, Laura Glulseppotti, Shapiro & Kreisman, Gerald Shapiro, David S. Kreisman, Karen Karates, Neil Gross, Frank Culhane, Felicia Renee Durkin, and Dominick Vinceslio; it is further

**ORDERED,** that the Court grants the motions to vacate the defaults of the defendants Shapiro & Kreisman, Gerald Shapiro, David S. Kreisman, Karen Karates, Neil Gross, Frank Culhane, Felicia Renee Durkin and Dominick Vinceslio; it is further

**ORDERED,** that the Court grants the motions by the defendants Philip Irwin Aaron, P.C., Paul Rudden, Marine Midland Bank, N.A., Marine Midland Mortgage Corp., Duane Leonard, Shapiro & Kreisman, Gerald Shapiro, David S. Kreisman, Karen Karates, Neil Gross, Frank Culhane, Felicia Renee Durkin and Dominick Vinceslio made pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Amended Complaint for failure to state a substantive or conspiracy civil RICO claim upon which relief may be granted; it is further

**ORDERED,** that the Court dismisses the Amended Complaint in its entirety without prejudice against the defendants Laura Glulseppotti, Stanley Stuart, Hongkong and Shanghai Bank Corp., Ltd. and the "John Doe" defendants because 120 days have passed since the Amended Complaint was filed and these defendants have not been served; and it is further

**ORDERED,** that the Court grants leave to the plaintiffs to replead the civil RICO conspiracy cause of action pursuant to 18 U.S.C. 1962(d) only, against the following defendants only: Marine Midland Bank, N.A., Marine Midland Mortgage Corp., Duane Leonard, Philip Irwin Aaron, P.C., Paul Rudden, Shapiro & Kreisman, Gerald

Shapiro, David S. Kreisman, Karen Karates, Neil Gross, Frank Culhane, Felicia Renee Durkin and Dominick Vinceslio. Such second amended complaint must be filed and served within thirty days of the date of this Order.

**SO ORDERED.**