**FD PROPERTY HOLDING, INC. and Fresh Direct, Inc., Plaintiffs,**

v.

**US TRAFFIC CORP., Walter J. Rogers, Bryan Mulligan, Robert J. Underwood and Gary Coury Defendants.**

No. 01–CV–8516(ILG).

United States District Court, E.D. New York.

June 19, 2002.

---

Jeffrey C. Slade, Slade & Associates, P.C., New York City, for plaintiffs.

*MEMORANDUM AND ORDER*

GLASSER, District Judge.

### SUMMARY

Plaintiffs FD Property Holding, Inc. ("Property Holding") and Fresh Direct, Inc. ("Fresh Direct") bring this action against defendants U.S. Traffic Corp. ("US Traffic"); Bryan Mulligan ("Mulligan"), Chief Operating and/or Technology Officer of Display Solutions, Inc. ("Display Solutions"), a wholly-owned subsidiary of U.S. Traffic; Robert J. Underwood ("Underwood"), Vice–President of Facilities of U.S. Traffic; Walter J. Rogers ("Rogers"), the *"de facto* shareholder" of U.S. Traffic; and Gary Coury ("Coury"), the president of Display Solutions, alleging claims under the Racketeering Influenced and Corrupt Organizations ("RICO") Act, 18 USC. § 1962(c) and (d), and common law claims for breach of contract and fraudulent inducement.[1] Defendants move to dismiss the RICO claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and to dismiss the remaining claims pursuant to 28 U.S.C. § 1367(c). Plaintiffs oppose the motion and cross-move for leave to amend the complaint.[2] For the reasons that follow, the motion to dismiss the amended complaint is granted.

### BACKGROUND

The facts summarized here, which are assumed to be true for purposes of this motion, *see Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985), are from plaintiffs' amended complaint. Plaintiffs allege that U.S. Traffic, via its officers and *de facto* shareholder, engaged in three schemes to defraud them of more than $1.3 million. (*See* Am. Compl. ¶ 1.) The first scheme involved inducing plaintiffs through various acts of wire and mail fraud to enter into a contract with Display Solutions for the purchase and installation of a large electronic sign that would advertise Property Holding's new store, Fresh Direct. The sign was to be placed above Property Holding's headquarters in Long Island City, New York, immediately adjacent to the Queens Midtown Tunnel. (*Id.*) The second scheme involved concealing and misrepresenting facts from plaintiffs about Display Solutions' progress on the construction of the sign. The third and final scheme involved drawing down the remaining unpaid amount of the contract under a

---

1. Plaintiffs allege that Rogers is the *"de facto"* shareholder based on his marriage to Leslie Welch Rogers, who is the 99% owner of a limited liability corporation which owns 85% of U.S. Traffic. (*See* Am. Compl. ¶ 6, attached to Pls.' Not. of Cross–Mot.)

2. Although plaintiffs seek permission to amend the complaint, they acknowledge (at note 4 in their brief) that leave is not required because no responsive pleading has yet been served. *See* Fed.R.Civ.P. 15(a) (a party may amend as a matter of right at any time before a responsive pleading is served); *Barbara v. N.Y. Stock Exch., Inc.,* 99 F.3d 49, 56 (2d Cir.1996) (holding that a motion to dismiss is not a responsive pleading). In reply, defendants ask the Court to consider their motion to dismiss as it pertains to the amended complaint. (*See* Defs.' Reply Br. at 1 n. 1.) Accordingly, the Court will consider defendants' motion to dismiss the amended complaint, which notably makes only two changes to the RICO claim as originally pled.

letter of credit by making false representations to the issuing bank. For these alleged acts, plaintiffs seek more than $15 million in damages, including the contract price, the cost of a replacement sign, and the estimated amount for lost advertising revenue. (*Id.* ¶¶ 1, 72–74.)

### I. *The Origins of Fresh Direct*

Property Holding and Fresh Direct are affiliated Delaware corporations with their principle places of business in Long Island City, New York. (*Id.* ¶¶ 2–3.) Fresh Direct will soon begin marketing and delivering food from 23–30 Borden Avenue in Long Island City, a property owned by Property Holding, to residential customers throughout New York City. (*Id.* ¶ 3.) In the 1990s, Property Holding's Chief Executive Officer, Joseph Fedele ("Fedele"), purchased a large electronic sign from Display Solutions to advertise its Fairway store on 125th Street in Manhattan. (*Id.* ¶¶ 13–14.) Based on the success of that sign as a marketing technique, in October 1999, Fedele contacted Display Solutions (in addition to other vendors) to discuss the construction of a sign for Fresh Direct. (*Id.* ¶¶ 14, 16.)

### II. *The Alleged Fraudulent Scheme to Obtain a Lucrative Contract*

Fedele told Display Solutions that he wanted a 90–by–65 foot sign that could display full graphics and video in a range of 16,000,000 authentic colors that could be seen from as far as three miles away, and that he wanted to erect the sign as soon as possible. (*Id.* ¶¶ 17–18.) Plaintiffs allege that Display Solutions made the following false statements regarding its abilities and experience to assure plaintiffs that it could build a sign that would meet their expectations. In October and November 1999, Display Solutions' Sales Manager, Michael Rhoads, told Fedele that Display Solutions "leads the industry" in this kind of product, that it had constructed a similar sign in the past and that it had the experience and ability to construct the sign that Fedele wanted. (*Id.* ¶ 19.) In addition, Rhoads told Fedele that Display Solutions had the ability to complete the sign within the desired time period—"as soon as possible." (*Id.* ¶ 21.) About a month later, Rhoads sent Fedele a videotape which featured a sign that Display Solutions had built and installed at the Georgia Tech football stadium in Atlanta, Georgia. (*Id.* ¶ 22.) In early November 1999, Rhoads sent Fedele two versions of the sign with two price quotes and stated: either version will "provide a clearer and more detailed image than the GA Tech video that you have seen. Because of the unique technology that we offer, I am confident that either ... will have a cleaner and crisper picture ... than any of the similar products offered by our competitors." (*Id.* ¶ 23.) Plaintiffs also allege that defendant Mulligan made similar false statements "in one or more phone conversations in December 1999 and January 2000." (*Id.* ¶ 25.) In those conversations, Mulligan told Fedele "that Display Solutions had a 'proven track record,' that they were 'fully capable of handling the project,' that they had the 'technical know-how to build the sign' and that the project could be completed in the desired time frame." (*Id.* ¶ 26.) Plaintiffs decided to purchase the sign from Display Solutions.

In the period from the end of 1999 through April 2000, plaintiffs took possession of the property where the sign would be located and obtained a city permit for the sign.[3] (*Id.* ¶ 26.) The contract for the

---

**3.** Plaintiffs admit that defendants had nothing to do with this four month delay before negotiating the contract. (*See* Am. Compl. ¶ 26.)

sign was negotiated between May 1 and 9, 2000. (*Id.* ¶ 28.) Plaintiffs allege that, during the negotiations, defendants continued to make false statements. They allege that Rhoads represented that the sign would be completed within thirteen weeks, which was never possible. (*Id.* ¶ 27.) A copy of the draft contract that was returned to Property Holding stated that the sign would "equal or exceed the appearance [sic] and capability of the Georgia Tech sign shown in the video," would be "capable of 14,000 NITs" (a measure of brightness), and could display "Standard VHS tape recorder and player," "Standard DVD player" and "Camera Interface" in "65,000 color mode (Georgia Tech Sign)" and "16.7 color mode."[4] (*Id.* ¶ 30.) However, plaintiffs allege that the Georgia Tech sign was not capable of 65,000 color mode as it could barely perform at the 265 color level. (*Id.* ¶¶ 27, 31.) The draft contract also contained a requirement that Property Holding secure its performance with a letter of credit of $500,000. (*Id.* ¶ 32.) Fedele found this to be objectionable, but was told at a conference call on May 5th by Rogers and Mulligan that U.S. Traffic insisted that the letter of credit be part of the contract. (*Id.* ¶ 33.)

Before signing the contract, Fedele sent a representative to Atlanta to meet with Display Solutions and to view the Georgia Tech sign. (*Id.* ¶ 34.) The contract was then signed in New York by Fedele on May 9th, and by Mulligan in Georgia on May 10th, and then again in New York on May 11th. (*Id.* ¶ 35.) Property Holding made its first of four payments in the amount of $325,000. (*Id.* ¶ 36.) Defendants proceeded to work on the sign that summer, but were delayed, according to plaintiffs, because the bank did not timely supply the letter of credit. (*Id.* ¶ 41.)

Work on the sign continued thereafter until early September 2000. (*Id.* ¶¶ 41–42.)

III. *The Alleged Scheme to Hide the Truth About Display Solutions' Progress*

In September 2000, Display Solutions represented that the sign was "available for factory acceptance testing ... and Buyer approval." (*Id.* ¶ 43.) However, plaintiffs allege that defendants concealed the fact that their procedure for building a sign of such magnitude had never been tested and anyone skilled in the trade would have instantly known that it was completely inadequate to accomplish the task. (*Id.* ¶ 42.) In any event, plaintiffs sent two representatives to Atlanta to witness the test at Display Solutions' facility, but were told when they arrived that the facility was not capable of testing such a massive sign. (*Id.* ¶ 45.) Consequently, a test of only two of the twenty-six panels was performed, which plaintiffs allege was a ploy to hide the defect in the sign's design and construction. (*Id.* ¶ 46.) Because the entire sign was not tested, Fedele refused to release the check for the second payment of $325,000. (*Id.* ¶ 46.) Mulligan subsequently spoke to Fedele on the telephone and explained to him that Display Solutions did not have sufficient electrical capacity or space at its plant to test the whole sign, and without receiving payment it would stop all work. (*Id.* ¶ 47.) Fedele then authorized the second payment. (*Id.*)

In early October 2000, defendants sent the unassembled sign to New York, which Property Holding then erected. (*Id.* ¶ 48.) Plaintiffs allege that defendants did "virtually nothing" to work on the sign in November and December. (*Id.* ¶ 49.) Yet, in early December, Display Solutions de-

---

**4.** Plaintiffs also allege that they first learned that Display Solutions was a division of U.S. Traffic by language in this draft contract. (*Id.*)

manded payment, even though the third installment was due upon "successful installation and operation of the sign." (*Id.*) Property Holding concluded, however, that it had no other alternative but to make the third payment. (*Id.* ¶ 50.)

With the sign now in place, Display Solutions sent Kyle Milliken ("Milliken"), a first time project manager and allegedly inexperienced employee, to New York to carry out the New York end of the project. (*Id.* ¶ 51.) Milliken immediately developed a schedule for the work from early December into the beginning of 2001. (*Id.* ¶ 52.) However, plaintiffs allege that he soon realized that Display Solutions lacked the ability to complete the sign project. (*Id.*) Milliken sent Display Solutions an internal email message to that effect and asked how he should deal with it. (*Id.* ¶ 53.) Plaintiffs allege that Milliken was told to hope that Property Holding did not ask any questions. (*Id.*)

In January 2001, plaintiffs solicited the help of Robert Slater ("Slater"), Fresh Direct's Chief Technology Officer, when it became apparent to them that something was fundamentally wrong with the project. (*Id.* ¶ 54.) Slater posed questions to Milliken and defendant Underwood, which were answered via email from Kleinjan Deetlefs ("Deetlefs"), U.S. Traffic's Senior Vice–President of Engineering. Deetlefs allegedly told Slater that the problems were software related, that a software revision to correct the problem would be installed upon completion of testing, and that color functionality of the sign "would be compatible to that demonstrated at Georgia Tech." (*Id.* ¶ 55–56.) Plaintiffs allege that these statements were falsely made to deflect Slater's suspicions. (*Id.*)

In early March 2001, Mulligan allegedly told Fedele that Display Solutions was short on cash and needed money to continue working on the sign. (*Id.* ¶ 57.) Because of this alleged "economic coercion," Fedele authorized a partial payment of $125,000. (*Id.* ¶ 57.) In late March, Fedele spoke to defendant Coury who told Fedele that he was not aware of what was happening with the sign and that he would "get on his people to solve the problem." Plaintiffs allege that Coury was well aware of the project and made this statement to induce Fedele to continue making payments.[5] (*Id.* ¶ 58.)

Plaintiffs allege that, in May 2001, Underwood got involved to "deflect FD Property Holding's frustration until final payment could be obtained." (*Id.* ¶ 59.) Specifically, Underwood sent Fedele a letter on May 9, 2001, stating that software engineers in South Africa "will have the final software and any required hardware fixes ready to put into the sign upon their return on May 21, 2001," and that the "[e]ngineers in South Africa do have a commercial sign on site to test the software and hardware for your sign." (*Id.*) On June 12, 2001, Underwood sent Slater an email, stating that two engineers and two technicians would arrive in New York with all the software and hardware needed to complete the task and that "everything should be fully operational in 65000 colors by [June] 29th." (*Id.* ¶ 60.) Plaintiffs allege that none of these promises were kept. (*Id.* ¶ 61.) On July 16th, Slater informed Underwood and Coury by email that the sign could only display 10 frames-per-second instead of the required 30 frames, that the sign was not displaying at the 14,000 NITs required by the

---

**5.** At this point, only the remaining portion of the final $325,000 installment was left to be paid.

contract and that 15% of the bulbs were not functioning. (*Id.*)

## IV. *The Alleged Scheme to Draw–Down the Letter of Credit*

At this time, the remaining unpaid portion of the contract price was approximately $228,000. (*Id.* ¶ 62.) The letter of credit was to expire on July 31, 2001. (*Id.*) Plaintiffs allege that the following communications reveal defendants' scheme to obtain final payment, ultimately leading to defendants' draw-down on the letter of credit. In an email sent on July 26, 2001, defendants attempted to characterize Slater's July 16th email as concerning a "final check to complete the installation," which check they might have used to argue that the contract had been fully performed. (*Id.* ¶¶ 61, 63.) However, Slater immediately corrected the misunderstanding in a return email by stating that his original email represented "a list of things that are open as of the last visit to get us to the point we can view and test 64K colors." (*Id.* ¶ 63.) On July 27, 2001, Coury sent Fedele a letter, stating that "Display Solutions is committed to completing your project next week, starting Monday July 30th" and offered to discount the final contract price from $228,151.72 to $171,113.79. (*Id.* ¶ 64.) Plaintiffs allege that Coury's letter noted that the letter of credit was about to expire and therefore characterized the remaining work to be done on the sign as the routine replacement of bulbs under a warranty agreement. (*Id.* ¶ 65.) Plaintiffs allege that they were not fooled by the "warranty agreement ploy," and refused to pay the remaining portion under the contract until the sign had been fully installed and operational for thirty days. (*Id.*) When payment was not forthcoming, plaintiffs allege that defendants then resorted to their final scheme—the draw-down on the letter of credit.

On July 31, 2001, Rogers signed and faxed to Fleet National Bank a "Drawing Certificate STATEMENT" certifying that the amount remaining under the contract—$228,151.72—was "Due and Unpaid under the Agreement Dated May 1, 2000 and held in Escrow by a Court of Competent Jurisdiction [sic] pending final resolution and full payment." (*Id.* ¶ 66.) Fleet then sent a bank check to the law firm of Cadwalader, Wickersham & Taft, which was "apparently then transmitted to U.S. Traffic but was not 'put into Escrow with the Court,' as required by the terms of the letter of credit." (*Id.* ¶ 67.) A few days letter, Fleet charged plaintiffs' bank account for the requisite amount. (*Id.*)

## V. *The Alleged Admissions of Fraud*

The complaint alleges that, on August 13, 2001, after obtaining the full $1.3 million, Coury met with Fedele and Slater and admitted to the following:

The sign could not possibly work the way it had been "designed" and would require a completely different configuration even to have the possibility of working. Mulligan lied when he said that Display Solutions had built a sign of this size. Display Solutions had stopped trying to develop a plan for the sign by August 2000. The sign, as installed, was not capable of displaying even the most rudimentary textual messages without "glitches." Mulligan (who by then had left the company) "had defrauded FD Property Holding from the beginning of their contacts." "Coury would do nothing more, since his hands 'were tied by the owner,' presumably defendant Rogers, who controlled U.S. Traffic and Display Solutions." (*Id.* ¶ 68.)

On August 24, 2001, Coury sent Fedele an email letter, allegedly admitting that he and Rogers "had never intended to honor the obligations under the contract." (*Id.*

¶ 69.) The letter, which was copied to Rogers, stated the following:

Dear Joe

Sometimes the most difficult thing to do is tell a client the product he has received meets the criteria the manufacturer intended to provide. I know your expectations for your sign · far exceed what Display Solutions intended to provide for the agreed upon price. As you are well aware the technology required to meet your expectations is currently available in the market. We could hire a third party to convert our ISO slots to the faster PCI slots. This would require an additional charge of $98,000 and approximately 6 months of intense development time.

If you agree let me know so that we can proceed immediately. Based on all the information currently available I am convinced this added feature would then meet your expectations.

(*Id.*) Plaintiffs rejected Coury's offer, and, instead, filed the present action.

In the complaint, plaintiff's first cause of action alleges a violation of Section 1962(c) of the RICO Act in that each defendant participated in the scheme to obtain the contract through deliberate misrepresentations, to collect the amount specified therein by hiding facts or making misleading or false statements about Display Solutions' experience, expertise and progress, and all defendants with the exception of Mulligan participated in the scheme to draw-down the letter of credit through fraudulent misrepresentations. (*Id.* ¶ 78.) Plaintiffs allege that defendants executed these scheme by using the mail and wires in violation of the federal mail-fraud and wire-fraud statutes. (*Id.*) Plaintiffs' second cause of action alleges a RICO conspiracy in violation of Section 1962(d) of the RICO Act. (*Id.* ¶¶ 82–84.) Plaintiffs' third and fourth claims allege breach of contract and fraudulent inducement. (*Id.* ¶¶ 85–95.)

The amended complaint makes two minor changes to the RICO claim. First, plaintiffs add a specific reference to the bank fraud statute, 18 U.S.C.. § 1344(2), in paragraph 78(b). Second, plaintiffs add the following paragraph:

The character of these acts shows that it was defendants' regular way of conducting business to misrepresent their past activities as well as their present capabilities and to insist on letters of credit at the beginning of a transaction, knowing (many months or even years in advance) that they would thus have an independent (albeit fraudulent) means to obtain the maximum amount from the transaction.

(*Id.* ¶ 81.)

Defendants move to dismiss the RICO claim arguing. that the complaint fails to adequately allege two predicate acts of fraud per defendant or show that these acts establish a "pattern of racketeering activity." (Defs.' Br. at 15–39.) They also argue that the RICO conspiracy claim must be dismissed because the complaint fails to allege an agreement. (*Id.* at 39–40.) Plaintiffs argue that the complaint adequately states valid claims under RICO.[6]

6. The Court notes that defendants have attached several exhibits to their motion including a copy of the complaint and exhibits allegedly attached thereto and a copy of the letter of credit which was explicitly referred to in the complaint. (*See* Defs.' Exs A–C.) On a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint or those documents which are incorporated therein by reference. *See, e.g., Brass v. Am. Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993). However, plaintiffs assert that "no documents were intentionally attached or incorporated by reference

## DISCUSSION

When deciding a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must take all allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Dwyer*, 777 F.2d at 828–29. A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Carrabus v. Schneider*, 119 F.Supp.2d 221, 225 (E.D.N.Y.2000) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### I. The RICO Claim

To state a claim for damages under RICO a plaintiff must allege (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)-(c); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983).

Because defendants' conduct does not "amount to, or pose a threat of, continuing criminal activity," plaintiffs have failed to adequately allege a "pattern of racketeering activity," and the amended complaint must be dismissed. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *GICC Capital Corp. v. Tech. Finance Group*, 67 F.3d 463, 465 (2d Cir.1995).[7]

The RICO statute defines a "pattern of racketeering" as requiring at least two predicate acts of racketeering activity defined in 18 U.S.C. § 1961(1) that occurred within ten years of each other. 18 U.S.C. § 1961(5). However, simply alleging two predicate acts without more is not sufficient to establish a pattern, which requires that a plaintiff must show both that the acts are related and continuous.[8] *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. 2893. The continuity requirement may be satisfied in one of two ways. A plaintiff must allege either an "open-ended" pattern of racketeering activity (i.e., past criminal conduct combined with a threat of future criminal conduct), or a "closed-ended" pattern of

---

into the Complaint," despite the fact that "an important piece of documentary evidence was inadvertently stapled to one copy of the complaint, which was then inadvertently served on one defendant." (*See* Pls.' Opp'n Br. at 2–3 n. 1.) Plaintiffs argue that this unidentified piece of evidence should not be considered on this motion to dismiss.

Contrary to plaintiffs' assertion, the original complaint filed with the Court in December 2001 does include numerous attachments, which are specifically referred to in the complaint. (*See* Compl. ¶ 35, which states "Copies of the final executed contract and transmittal documents are attached as Exhibit A.") In any event, whether the documents were intentionally attached to the complaint is of no particular relevance. Considering only the allegations in the amended complaint, the Court finds that it fails to state a valid RICO claim, and, accordingly, it must be dismissed.

**7.** Accordingly, as plaintiffs have failed to allege a "pattern," the adequacy of the pleadings as to predicate acts will not be given separate consideration. *See, e.g., Pier Connection, Inc. v. Lakhani*, 907 F.Supp. 72, 75–78 (S.D.N.Y.1995) (dismissing RICO claim for failure to adequately allege required continuity element to establish a pattern of racketeering activity); *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F.Supp. 579, 583 (S.D.N.Y.1989) (same).

**8.** Defendants do not challenge the relatedness of plaintiffs' alleged predicate acts. The predicate acts of mail fraud, wire fraud, and bank fraud are alleged to be part of the same scheme to defraud plaintiffs of monies under the contract. Thus, having the "same or similar purposes," the acts satisfy the relatedness element for showing a pattern of racketeering activity. *Bernstein v. Misk*, 948 F.Supp. 228, 236 (E.D.N.Y.1997) (quoting *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. 2893).

racketeering activity (i.e., past criminal conduct extending over a substantial period of time). *GICC Capital Corp.*, 67 F.3d at 466. Plaintiffs argue that the amended complaint satisfies each requirement.

## A. Open-ended Continuity

■ Open-ended continuity may be "established if the related predicate acts themselves involve a distinct threat of long-term racketeering activity," or external factors demonstrate that "the predicates are a regular way of conducting defendant's ongoing legitimate business." *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893. Inherently unlawful acts such as murder or obstruction of justice committed by an enterprise, an organized crime family, for example, the intended activity of which consists of racketeering acts, gives rise to the requisite threat of continuity even where the period spanned by the racketeering acts is short. *GICC Capital Corp.*, 67 F.3d at 466; *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir.1995). However, "in cases concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful, such as frauds in the sale of property, ... courts generally have found no threat of continuing criminal activity arising from conduct that extended over an even longer period." *Id.* The predicate acts in this case are not inherently unlawful. *See, e.g., Skylon Corp. v. Guilford Mills, Inc.*, No. 93–CV–5581, 1997 WL 88894, at *6 (S.D.N.Y. Mar.3, 1997) (holding that predicate acts of "verbal and written misrepresentations made over the telephone and in letters, constituting wire and mail fraud" are not "inherently unlawful," but rather are "typical of garden-variety fraud claims.")

Relying on *Nafta v. Feniks International House of Trade*, 932 F.Supp. 422 (E.D.N.Y.1996), plaintiffs argue that the alleged bank fraud—whereby defendants submitted an allegedly false statement to the bank for release of monies under the letter of credit—was an "inherently unlawful" activity. However, *Nafta* is inapposite. Unlike the case here, *Nafta* involved a massive fraud perpetrated by sophisticated operators on a large foreign corporation unskilled in western ways of business. *Id.* at 427. The predicate acts included several forgeries committed on applications to the Secretary of State of New York and to a premier banking institution and were held not to be "of the genre of an 'ordinary commercial case'" and should be exempted from the net cast by RICO. *Id.* The one time submission of an allegedly false statement under a negotiated letter of credit, as is alleged in this case, is not analogous. Moreover, crucial to the Court's finding of continuity in *Nafta* was the fact that the plan was not inherently terminable, as it ceased only when the plan had been uncovered, and external factors demonstrated the defendant's intent to continue the plan indefinitely. *Id.* at 427–28; *see also United States v. Kaplan*, 886 F.2d 536, 542–43 (2d Cir.1989) (courts should look to external facts when the nature of the conduct or the enterprise does not by itself suggest that the racketeering acts will continue). Here, the allegedly illegal activity has ended, and there is no indication of any intent to have it continue.[9]

---

9. Plaintiffs argue that the fact that defendants insisted that the contract include the letter of credit more than one year before seeking payment under it gives rise to an inference that their illegal conduct will continue in the future. Plaintiffs assert: "if they were willing to do such an outrageous thing here, what would stop them from doing it again?" (Pls.' Opp'n Br. at 18.) Such allegations are purely speculative and are insufficient to allege a threat of future criminal activity. *See, e.g., GICC Capital Corp.*, 67 F.3d at 466 (allegation that conduct would have continued had it not been for the commencement of the lawsuit

Allegations of conduct that by its nature or design has an intended and foreseeable endpoint will not constitute open-ended continuity. *See Aulicino,* 44 F.3d at 1113 (holding that the threat of continuity is not present where the defendant had a piece of property the sale of which, even if by fraudulent means, provided a natural end to the project). Here, allegations of mail, wire and bank fraud were committed in connection with the isolated sale of one product, the Fresh Direct sign. The full payment of $1.3 million, even if obtained through fraudulent means, constituted the natural end to that venture. *See GICC Capital Corp.,* 67 F.3d at 466 (finding no open-ended continuity because alleged scheme to deprive plaintiff of assets was "inherently terminable"); *Bernstein,* 948 F.Supp. at 237 (finding no continuity where predicate acts were part of one isolated real estate venture which terminated and there was no indication of repetition); *see also Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (noting Congress's intent to exempt RICO from isolated or sporadic activity).

Moreover, plaintiffs' allegation that defendants regularly conduct their business through similar fraudulent schemes is wholly conclusory and completely unsup-ported by the factual allegations in the complaint. *See* 2 Arthur F. Mathews, *et al.,* Civil Rico Litigation § 9.05[A] (2d ed.1992) ("bare assertions that ... defendant remains in the business" insufficient to satisfy open-ended continuity prong); *Thai Airways Intern. Ltd. v. United Aviation Leasing B.V.,* 891 F.Supp. 113, 119 (S.D.N.Y.1994) (complaint failed to adequately plead open-ended continuity because facts did not support allegation that lessors of airplanes unlawfully converted security deposits as their ordinary way of conducting business); *Passini v. Falke–Gruppe,* 745 F.Supp. 991, 993 (S.D.N.Y. 1990) (no threat of continuity where facts did not show plaintiff made a practice of defrauding clients); *Azurite Corp. Ltd. v. Amster & Co.,* 730 F.Supp. 571, 581 (S.D.N.Y.1990) (facts did not support allegation that defendants engaged in unlawful conduct as part of regular course of business). Plaintiffs assert that Coury's alleged after-the-fact admissions of fraud somehow imply that defendants have perpetrated similar fraudulent schemes in the past. This argument is completely untenable.[10] Even if Coury's statements are in fact admissions of wrongdoing in the context of this contract, this does not create an inference that defendants engage in similar wrongdoing as part of their regular business practices.[11] Thus, for all of these

was "entirely speculative"); *Bernstein,* 948 F.Supp. at 237 (allegation that the nature of the predicate acts "project into the future with a threat of repetition" was conclusory); *Ruby Dev. Corp. v. Charrim Dev. Corp.,* 742 F.Supp. 1213, 1217 (E.D.N.Y.1990) (conclusory allegation of concealment on the part of the wrongdoer is not enough to establish open-ended conspiracy or threat of repetition).

10. The Court notes that a review of Coury's alleged statements does not support an interpretation of admission of an intent to defraud. *See Soper v. Simmons Int'l Ltd.,* 632 F.Supp. 244, 249 (S.D.N.Y.1986) ("[M]ere failure of promised performance has never permitted a factual finding that defendants never intended to perform.").

11. The cases cited by plaintiffs in support of their argument are inapposite. Continuity was found to be present in both *Giuliano v. Everything Yogurt, Inc.,* 819 F.Supp. 240 (E.D.N.Y.1993), and *HMB Holding Co., Inc. v. Kaperst,* No. 90–CV–2966, 1991 WL 87383 (E.D.N.Y. May 21, 1991), based on specific allegations of multiple victims and multiple illegal schemes which lasted more than two years. As will be discussed in the following section, this case involves only a single victim and one basic scheme involving one contract which lasted less than two years.

reasons, defendants' conduct does not pass the test of continuity.

### B. *Close–Ended Continuity*

■ Closed-ended continuity generally is shown through conduct occurring over a "substantial period of time." *GICC Capital Corp.*, 67 F.3d at 467 (quoting *H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893). In addition to this temporal consideration, courts weigh the following other non-dispositive factors: (1) the number and variety of acts, (2) the number of participants, (3) the number of victims, and (4) the presence of separate schemes. *Id.; Bernstein*, 948 F.Supp. at 237; *Skylon Corp.*, 1997 WL 88894, at *5.

The complaint alleges that the scheme occurred over approximately 16 months.[12] (*See* Am. Compl. ¶ 78.) However, duration alone is not dispositive, especially in a case where the alleged illegal plan was directed at a single goal and the plan has terminated. *Mead v. Schaub*, 757 F.Supp. 319, 323 (S.D.N.Y.1991) (even though the scheme "may have required a number of steps over a determinate period of time, nevertheless because of its terminable nature and single goal it does not meet the requirement of continuity"); *Skylon Corp.*, 1997 WL 88894, at *7 ("where a RICO claim is based on acts narrowly directed toward a single fraudulent end with a limited goal, the claim will usually fail") (internal quotation marks and citations omitted).

Courts in the Second Circuit have generally held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is lacking in closed-ended continuity. This is the case even when the scheme's duration exceeds one year. *See, e.g., Bernstein*, 948 F.Supp. at 238 (no closed-ended continuity found in scheme which lasted four and a half years with only one major perpetrator, one group of purchaser victims, and a single, non-complex scheme to obtain financing for purchase of property and a default on a loan); *Mathon v. Marine Midland Bank, N.A.*, 875 F.Supp. 986, 998–99 (E.D.N.Y.1995) (holding that a single real estate transaction involving one alleged victim, a limited goal and criminal conduct which lasted approximately 15 months is not sufficiently continuous); *Cont'l Realty Corp. v. J.C. Penney Co., Inc.*, 729 F.Supp. 1452, 1455 (S.D.N.Y. 1990) (holding that a claim alleging fraud in a real estate transaction involving one victim, one group of perpetrators, and a single goal occurring over more than a year is not sufficient for closed-ended continuity); *Aero Voyagers, Inc.*, 721 F.Supp. at 583–84 (holding that a complaint alleging a closed-ended, single scheme involving nearly fifty mail fraud violations, three perpetrators, one victim and an uncomplicated transaction over a 13 month period failed to adequately plead continuity); *see also SMS Mktg. & Telecomm., Inc. v. H.G. Telecom, Inc.*, 949 F.Supp. 134, 144 (E.D.N.Y.1996) (plaintiff failed to allege

---

12. However, plaintiffs assert in their brief that the scheme lasted approximately two years from October 1999 to September 2001. (*See* Pls.' Opp'n Br. at 17.) Defendants argue that the scheme lasted approximately 13 months beginning in May 2000 (when the contract was negotiated and signed) and ending in August 2001 (with the final payment under the letter of credit). (*See* Defs.' Reply Br. at 8–9.) In arguing for a shorter period, defendants ask the Court to exclude the time from October to December 1999 when plaintiffs were "shopping" the product, as well as the next four months when plaintiffs were acquiring a permit and the location for the sign. While the "shopping" phase is undeniably integral to plaintiffs' fraudulent inducement allegations, to say the scheme occurred continuously for two years would not be accurate. Thus, the Court will assume that the scheme lasted approximately sixteen months.

pattern of racketeering activity based on single scheme that extended for less than a year and which involved one allege corporate perpetrator, one corporate victim, and a simple breach of contract); *Pier Connection, Inc.*, 907 F.Supp. at 78 (finding no closed-ended continuity despite plaintiffs attempt to characterize scheme which lasted 10 months as multi-faceted and complex; complaint demonstrates that defendants engaged in only one scheme whose single goal was to seize control of plaintiff's business); *Nationwide Cellular Serv., Inc. v. Am. Mobile Communications, Inc.*, Nos. 90–CV–6493, 91–CV–3587, 1991 WL 233284, at *14 (S.D.N.Y. Oct. 29, 1991) (closed-ended continuity not satisfied when scheme lasted only 11 and a half months, involved only one victim, one set of perpetrators, and the limited goal of one securities fraud transaction).

Despite plaintiffs' effort to create three separate schemes, the criminal conduct alleged in this case involves a limited number of perpetrators and an alleged non-complex scheme to obtain monies under a sales' contract. Indeed, the complaint states quite explicitly: "the underlying goal of the [conspiracy was to] separate FD Property Holding from $1.3 million." (Am. Compl. ¶ 33.) Although plaintiffs argue that Fleet Bank may be a possible victim and the Cadwalader firm may be either a victim or a participant, the facts do not support such inferences. The bank has suffered no loss because it recouped its monies from plaintiffs' bank account immediately after paying defendants. Moreover, plaintiffs' suggestion that the bank may be liable to plaintiffs is specious, as are their assertions as to the law firm. The conduct is simply lacking in closed-ended continuity.

Thus, having failed to adequately plead either open-ended or closed-ended continuity, the RICO claim must be dismissed.

## II. *The RICO Conspiracy Claim*

■ Section 1962(d) makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 28 U.S.C. § 1962(d). A "RICO conspiracy requires evidence that [a defendant] participated in the enterprise through a pattern of racketeering activity, or agreed to do so." *United States v. Tellier*, 83 F.3d 578, 581 (2d Cir.1996). Because the RICO conspiracy claim is dependent upon the Section 1962(c) RICO claim, dismissal of that claim mandates the dismissal of the RICO conspiracy claim. *See Purgess v. Sharrock*, 806 F.Supp. 1102, 1110 n. 9 (S.D.N.Y.1992) (dismissal of the underlying RICO claim for failure to allege a pattern of racketeering activity mandates dismissal of the RICO conspiracy claim); *Farberware, Inc. v. Groben*, 764 F.Supp. 296, 307 (S.D.N.Y.1991) (dismissal of the underlying RICO claim requires dismissal of the RICO conspiracy claim).

Moreover, the Court notes that "a RICO conspiracy allegation should be more than a conclusory add-on at the end of a complaint. It should state with specificity what the agreement was, who entered into the agreement, when the agreement commenced, and what actions were taken in furtherance of it." 1 Mathews *et.al.*, supra, § 9.07; *see Com–Tech Assocs. v. Computer Assocs. Int'l*, 753 F.Supp. 1078, 1092 (E.D.N.Y.1990) ("Bare or conclusory allegations of participation in a conspiracy under 1962(d) will not avail on a motion to dismiss, and the plaintiff must plead allegations that each defendant knowingly agreed to participate in the conspiracy, particularly when the predicate acts alleged are fraud."); *Grunwald v. Bornfreund*, 668 F.Supp. 128, 133 (E.D.N.Y. 1987) ("bare allegations of conspiracy ... are insufficient to support a civil RICO claim"). Plaintiffs' conspiracy claim

states: "Each of these defendants agreed to commit each of the two or more predicate acts in which they were directly involved, as set forth in detail above." (Am. Compl.¶ 84.) The claim also incorporates all the prior allegations in paragraphs 2 through 80. (*Id.* ¶ 82.) Plaintiffs' allegation of an agreement without more is inadequate to state a claim for RICO conspiracy.

As aptly stated in *Mathon:* "[A]lleged RICO violations must be reviewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations." *Mathon,* 875 F.Supp. at 1001. Simply put, this case is a breach of contract case, not a RICO case, and plaintiffs' attempt to cast it as such must be rejected.

III. *Common Law Claims*

In light of the Court's dismissal of the RICO claims, which formed the basis of federal jurisdiction in this case, the Court declines to exercise pendent jurisdiction over plaintiffs' common law claims for breach of contract and fraudulent inducement. *See* 28 U.S.C. § 1367(c)(3); *Block v. First Blood Assocs.,* 988 F.2d 344, 351 (2d Cir.1993); *Mathon,* 875 F.Supp. at 1002. Accordingly, these claims are dismissed without prejudice.

### *CONCLUSION*

For the foregoing reasons, the motion to dismiss the amended complaint is granted.

SO ORDERED.